2021 IL App (2d) 200406-U
No. 2-20-0406
Order filed May 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-928 |
| KEVIN F. GRAF, | ) ) ) | Honorable Robert A. Wilbrandt, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The evidence was sufficient to sustain defendant's convictions for criminal sexual abuse and criminal sexual assault. (2) Defendant's numerous challenges to the trial court's evidentiary rulings are unavailing, where: (a) as to the victim's testimony and his sixth amendment claim, they are forfeited and, even if there was error, they are not reviewable for plain error, where the evidence against defendant was overwhelming and he was not denied a fair trial; and (b) as to his own testimony, they are forfeited, not reviewable for plain error, or any error was harmless beyond a reasonable doubt and there was no cumulative error. Affirmed.

¶ 2    After a bench trial, defendant, Kevin F. Graf, was convicted of one count of criminal sexual

assault (720 ILCS 5/11-1.20(a)(1) (West 2018)), two counts of criminal sexual abuse (720 ILCS

5/11-1.50(a)(1) (West 2018)), and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2018)). The trial court denied his motion for a new trial and sentenced defendant to four years' imprisonment on the criminal-sexual-assault conviction and two years' conditional discharge on the criminal-sexual-abuse convictions. The court merged the unlawful-restraint conviction into the criminal-sexual-assault conviction. The court also ordered defendant to pay restitution, undergo medical testing, and register as a sex offender. Defendant appeals, challenging the sufficiency of the evidence against him and numerous evidentiary rulings. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State alleged that, on September 17, 2018, defendant committed criminal sexual assault, where, by use of force, he stuck his hand up Jessica V.'s (born on January 21, 1991) shorts and digitally penetrated her vagina. It further alleged that defendant committed two counts of criminal sexual abuse, where, by use or threat of force, he, either directly or through clothing, knowingly fondled Jessica's breasts and touched his sex organ to her buttocks. Finally, the State alleged that defendant committed unlawful restraint, where he, knowingly and without legal authority, grabbed Jessica from behind and placed her in a headlock and held her to the floor.

¶ 5                                         A. Trial

¶ 6                                        1. Jessica

¶ 7     Trial commenced on February 21, 2020. Jessica, age 29, testified that she lives in Lakemoor in a townhome she owns. She met defendant in April 2018 via Tinder, a dating app. She was looking for someone to date. They started out as friends and, shortly thereafter, started "casual dating."

¶ 8     On Sunday, September 16, 2018, Jessica and defendant went to Sweet Melissa's bar in Lakemoor. Defendant picked her up from her home and drove to the bar, where they watched a

football game and had a "couple" of drinks. The couple left the bar at about 5:30 p.m. and went to Jessica's home. There, they played video games from 6 p.m. until the following morning.

¶ 9     At about 6 a.m. on Monday, September 17, 2018, Jessica stood, playing video games in front of her television, and defendant watched her play. Defendant then came up behind her and tried to give her a bear hug, but Jessica asked him to stop because she wanted to play the game. Defendant sat back down on the couch. He watched Jessica play for about 5 or 10 minutes and then came up behind her and knocked the game controller out of her hand. Jessica turned around, and "it turned into like physical going at me to try and like take me down, and I turned around and tried to not let that happen and we had got onto the ground, carpet area[.]" Jessica was on her hands and knees, and defendant was behind her. They wrestled, defendant tried to keep both of Jessica's legs together, and she tried "to maneuver out." Defendant held up Jessica's left arm, and, with his other arm, he tried to put her in a hold. He then tried several times to pull down Jessica's shorts. According to Jessica, she said, "several times," "Kevin, no, stop" and "Kevin, what are you doing?" She kept trying to pull up her shorts. Defendant then "went into my shorts from below and then maneuvered my underwear and started to penetrate me [with his finger] in my vaginal area and I was asking him to stop, and any time I tried to move my hips or legs, then he would go and grab my breast area, all while he was thrusting behind me and I'm just hearing him breathing and I was asking him to stop and he's not stopping." Defendant penetrated her for about 10 minutes, and he kept thrusting and trying to hold down Jessica's left arm to keep her on her stomach on the carpet. She felt his erection near her "butt" area.

¶ 10     Jessica turned onto her knees and stood. Defendant also stood, grabbed her by the neck, had her head down into a hold (for about one minute), and started to choke her. Jessica testified that she felt that she could not breathe and that things got "black and foggy." She put her right leg

behind defendant's leg and tried to get his body weight off stance. They both fell, because defendant continued to hold onto Jessica's neck. Jessica fell onto her knee and elbow, and defendant fell back into the closet area in her kitchen. Jessica asked defendant to leave several times and told him that she was going to call the police. Defendant left.

¶ 11    About two hours later, at around 8:30 a.m., defendant texted Jessica. She did not respond. The next day, defendant texted her again, and she did not respond. On Wednesday, September 19, 2018, defendant text Jessica again, and she responded. He never tried to call her.

¶ 12    Also on Wednesday, Jessica went to the police and showed them the text messages. The police took photographs of Jessica. Over objection, she described what the photographs depicted. One depicted scratch marks near her ear and neck area. Jessica testified that she sustained the injuries while defendant was choking her. Another photograph depicted carpet burn marks on her knees that she testified she sustained trying to get away from defendant. Jessica also described a bruise on her elbow that she sustained when she and defendant fell after she used her leg to make him lose his balance. Jessica provided the police with a written statement.

¶ 13    On cross-examination, Jessica testified that she and defendant started dating around May 2018. Defendant came to her house and, while in her garage, they had a conversation. Jessica denied that she laid down sexual ground rules. The trial court sustained a relevance objection when defense counsel asked if she told defendant that she did not use birth control. The court also sustained an objection when counsel asked her if she told defendant that, while dating her, he had to have a condom with him. The State noted to the court that it had filed motions *in limine* to bar any evidence of sexual reputation or opinion evidence and argued that defense counsel's question were trying to get into that line of questioning. Defense counsel responded that an exception was the element of consent. The court noted again that it was sustaining the objection.

¶ 14    Jessica further testified that she and defendant usually hung out at her house, and she denied that they had a habit of play fighting. When asked if she wrestled with defendant, she replied, "We played sports and, yeah, we like playfully in the—in like the living room area, yes[.]" Jessica could not recall the first time that she play wrestled with defendant. Jessica could not recall the first time she had sex with defendant, but it was probably the end of May or beginning of June 2018. She could not recall if she play fought with him that first time they had sex. When counsel asked Jessica how many times she and defendant had sex, the court sustained a relevance objection.

¶ 15    When asked about her alcohol consumption, Jessica denied that defendant brought her a 1.75-liter bottle of rum at 2:30 p.m. on Sunday, September 16, 2018. He had done so in the past. At Sweet Melissa's, Jessica had two rum-and-Diet Coke drinks. She had an additional two drinks over the hours the couple played video games at her home.

¶ 16    Jessica denied that she and defendant played a game called UFC on the morning of September 17, 2018. They had played it previously, and she was aware that it is a fighting game with punches, kicks, and wrestling. She denied that, while playing other games that morning, she asked defendant what a "guillotine choke" was. She had heard the term before from defendant. When asked if she recalled what happened the first time she and defendant wrestled, Jessica responded that she did not, because they did not just wrestle. She explained, "We mostly played sports and then we would get like where we would tease each other more." "I'm specifically recalling too this in reference to the Forrest Gump movie, like Lieutenant Dan, we would just— like I would see if I could even like carry him somewhat and that's all we did, and then like nothing that was playful like interaction between one and two people. I don't recall cool wrestling and guillotine holds before that[.]" She denied asking defendant to put her in a guillotine choke. The court sustained a relevance objection when counsel asked if defendant had ever put her in a choke.

¶ 17   Jessica denied that she drank rum and Diet Coke in a large plastic cup all night. She drank out of a blue plastic cup and did not know how many ounces it held. It was not a large cup. She made her own drinks, but does not know how much alcohol was in them.

¶ 18   On re-direct examination, Jessica testified that she stopped drinking around 2 a.m. on September 17, 2018. She also stated that that morning was not playful, although, on prior occasions, she and defendant playfully wrestled.

¶ 19                    2. Officer Eric Francke

¶ 20   Lakemoor police officer Eric Francke testified that, on Wednesday, September 19, 2018, he responded to a dispatch at the police department to meet with Jessica, who wanted to make a report about being sexually assaulted by defendant. Another officer took photographs of the bruising on Jessica's body. Officer Francke took photos of her text messages, and Jessica provided a written statement.

¶ 21   On September 20, 2018, officer Francke went to defendant's house and asked defendant to come to the police department to talk. Defendant complied. Defendant was placed in an interview room, and the interview was audio and video recorded. The recording was entered into evidence and played.

¶ 22   Officer Francke testified that defendant told him that the couple were having drinks at Sweet Melissa's and watching football. Afterward, they went to Jessica's house to hang out and play video games. In the morning, defendant tried to wrestle with Jessica "and was wrestling as he said they always do and that it got into where he digitally penetrated her and grabbed her and held her." Defendant told officer Francke that he put Jessica in a head lock with her head in his elbow and pulled her down and tried to pull off her shorts. Defendant also stated that Jessica told him to "let go" and "no." They continued to wrestle and, eventually, defendant got up and left.

Defendant tried to contact Jessica several times afterward via text messages and phone calls, but she did not respond for several days. Defendant showed officer Francke the text messages on his phone, and Francke took photos of the messages, which were admitted into evidence. Defendant also agreed to provide a written statement, which was also admitted into evidence.

¶ 23    On cross-examination, officer Francke testified that, when defendant stated during the interview that he knew he got his "hand in there," Francke did not ask him what he meant by "there," because he was already relating having his hand up Jessica's shorts. Francke understood defendant to mean the shorts and Jessica's vagina. Further, the closest defendant came to admitting he digitally penetrated Jessica's vagina was when he said, "If Jessica said I did, I probably did." When shown a copy of his report and asked where it stated that defendant admitted he put his finger in Jessica's vagina, officer Francke stated, "I'm sorry, this is where I thought it was, but I had put in here that he said that he probably did." Francke noted that he followed up and asked defendant, if Jessica said that he fingered her for several minutes, would that be correct. Defendant was very cooperative during the interview.

¶ 24    On re-direct, officer Francke testified that defendant denied that he "fingered" Jessica for five minutes, as Jessica had stated, and he said that it was only for about 10 seconds. Defendant stated that his hand went up Jessica's shorts.

¶ 25                                    3. Text Messages

¶ 26    On Monday, September 17, 2018, at 8:28 a.m., defendant texted Jessica, "Good night sexy. If you're free tomorrow let me know so that we can be together again" and "You missed out on the good version of whiskey dick. The version where I could go all damn day hahaha. I gave up. Good night/day. I'll talk to you later. Oh and let's have some fun tomorrow :)[.]" On Monday, at 2:23 p.m., he texted her, "Good afternoon gorgeous. How are you doing[?]" At 8:04 p.m.,

defendant texted, "Hey jess. How has your day been?" On Tuesday, September 18, 2018, at 5:01 a.m., defendant texted "Good morning cutie. I'm leaving for work in about 20 minutes. Let me know if we can see each[ ]other today[.]" At 1:46 p.m., he texted, "Good morning [J]ess. How are you today[.]" At 4:40 p.m., he texted about work. At 7:16 p.m., defendant texted, "Babe? I'm assuming not today. How does Friday work for seeing each[other]." The next day, Wednesday, September 19, 2018, at 7:19 a.m., defendant texted Jessica, "Good morning princess. I hope you have a good day :)[.]"

¶ 27    At 9:35 a.m., Jessica sent her first text response, writing, "Kevin I was saying no and to stop and you were still trying to get in my pants and did get in my pants and did get your finger in me all while I was saying no and to stop and turning away. That's not okay." Defendant responded, "I'm sorry [J]ess. I should've realized. I was only being playful. I am very truly sorry[,]" "It is not ok. I'm so sorry. I'm ashamed of my self now[,]" and "There's nothing I can do to make up for that. I'm so so sorry. I understand if you can't forgive me. I don[']t deserve it[,]" and "I'm horrified and disgusted with myself. I've never done anything like that before, and I'm going to always continue to strive to never do anything that stupid again. I'm sorry Jessica. I'll stop now. I never meant to hurt you." Jessica replied, "It's not playful when I am trying to pull my pants up, trying to block your hand, saying no and to stop, and then you went from the bottom of my shorts anyway[.]" Defendant responded, "I know. I'm so sorry Jess. It's something I've never done and will never do again. I hate myself for this. There's no excuse for it at all. I'm disgusted with myself and how I carried on. I know there's no foregiveness for this. Fuck I hate myself now. I know. I want to bring myself in to the police because of this. This is horrible and I feel horrible."

¶ 28                        4. Defendant's Interview

¶ 29    During the interview, defendant stated that "I guess I went too far."  He was trying to "finger" Jessica, and she said no.  "I know it's wrong," and "I feel horrible about it."  Defendant also stated, "I will take her word for it," in reference to whether his finger penetrated her vagina.  When asked if he tried to pull down Jessica's shorts, defendant responded that, if Jessica said he did, then "I must have."  When officer Francke stated that defendant had already admitted that "biggest thing," that he had stuck his finger in Jessica's vagina, defendant replied, "yeah."  Defendant also admitted, unprompted, to groping Jessica's breasts.  He also agreed that Jessica "said no" and "she had been saying no."  "I know it was wrong and I feel horrible about it."  He could not recall everything that transpired that evening because he was tired and had "polished off a bottle of Jameson."  Defendant admitted that he put his finger in Jessica's vagina.  When officer Francke asked if Jessica was correct in saying that defendant was fingering her for five minutes, defendant responded "no," it was about 10 seconds at most.  "If she says she got my hand away, I fully believe her story[.]"  Defendant stated that he had his "wires crossed" and, thus, did not react appropriately to Jessica's rejections.

¶ 30                    5. Defendant's Written Statement

¶ 31    In his statement, defendant wrote that, after he hit his head in the kitchen, the couple stood and that Jessica asked him to show her a guillotine hold.  He demonstrated it, but wrote that he did not "squeeze hard."  They had flirted all night and, once they moved to the living room, they laid on the floor and play wrestled.  Defendant tried to "play with her" while they hand wrestled.  Jessica did not indicate that anything was "unwarranted."  "I got my hands down to her pants and attempted to take them down a little bit.  No skin was showing.  I then moved my hand down below her shorts and put one finger between her shorts and vagina.  I do not believe any penetration happened at that point.  She pushed my hand away and asked me to stop.  I did and we both got

up and went back to her kitchen where she told me I should go and get some rest before work." Defendant sent Jessica a text after he arrived home, and she did not reply to it. He sent more texts in the following days and received no responses to those texts. He asserted that he has "never physically harmed or threatened to commit physical harm" to Jessica. On September 19, 2018, Jessica texted defendant that his actions were "unwarranted, to which I replied how sorry I was and how truly devastated I was with that knowledge."

¶ 32    The State rested. The trial court denied defendant's motion for a directed finding.

¶ 33                                6. Defendant

¶ 34    Defendant, age 27, testified that his first date with Jessica was on May 12, 2018. He picked her up and they went out to dinner. Afterward, they went back to her house, talked, and Jessica brought up the "ground rules." The trial court sustained the State's hearsay objection as to what the ground rules were.

¶ 35    Defendant further testified that he next saw Jessica one week later. They hung out, went to Sweet Melissa's, came back to her house, and played video games. Defendant worked nights, and Jessica worked during the day, but, every other weekend, they had the full weekend off and spent time together. On their second or third date, in late May, they wrestled. It occurred at Jessica's house. Defendant had given her a hug, and she swept her foot behind defendant's and brought him down to the ground. Jessica climbed on top of defendant and pinned him down. She laughed and was having fun, as was defendant. They joked and trash-talked each other. Around one week later, they wrestled again in Jessica's apartment. It started the same way, with Jessica using her leg to get defendant on the ground. They had fun.

¶ 36    Defense counsel asked if, around July 4, 2018, Jessica had said she was unhappy with their relationship. The trial court sustained the State's hearsay objection. On July 4, 2018, the couple

was at Jessica's house and had decided not to go out and watch the fireworks. Defendant left around 1 a.m. At some point, defendant returned to Jessica's apartment. Jessica let him in, and they "talked about what the relationship was."

¶ 37    When asked when they first had sexual intercourse, the State raised a relevance objection and asserted a violation of the rape-shield statute. The trial court overruled the objection, and defendant responded that they had sex about one or two weeks later. Prior to having intercourse, the couple wrestled. It started with Jessica sweeping defendant's leg away and bringing him down. They wrestled for a little while, and Jessica invited defendant to have sexual intercourse. They engaged in consensual sex.

¶ 38    When defense counsel asked when the couple next had sex, the State raised a relevance and foundation objection and the court commented, "Well, are you going to go through each and every one of these, [defense counsel]? Because I don't think it would be relevant to our incident." Counsel responded that he intended to go through three occurrences, and the court allowed the questioning. At that point, the State argued that the defense had never filed an answer or a defense of consent. Defense counsel pointed out that the State had to prove the lack of consent. The court overruled the objection.

¶ 39    Defendant testified that, about one month later, in late July, the couple had sex a second time. It was preceded by play wrestling. At no point in their relationship did Jessica state that she did not want to play wrestle with defendant. Nearly every time, Jessica initiated the play wrestling. She also asked to play fighting games and asked defendant what a choke hold was and how to get out of it.

¶ 40    On Sunday, September 16, 2018, at around noon, the couple were at Sweet Melissa's bar, watching football. Defendant had brought 1.75 liters of rum for Jessica that she had asked him to

pick up for her, and he opened it that night; only Jessica drank out of that bottle. (By the next morning, about half of the bottle was gone.) They spent about five hours at the bar. Defendant had four beers, and Jessica had three or four rum and Diet Cokes, which was her usual drink. Afterward, they went to a candy store to purchase candy and then went to Jessica's house. They went fishing for a couple of hours. Around 8:30 or 9 p.m., they returned to Jessica's house and played video games, including a UFC game (a game involving a sport fighter against another fighter). Defendant drank two double Jameson whiskey drinks between 4 p.m. and 6:30 a.m. the following morning. Jessica drank four or five rum and Diet Cokes out of a tall cup (such as a McDonald's large cup). Defendant testified that he made Jessica's drinks and mixed 50% rum, 25% Diet Coke, and 25% ice (she preferred her drinks to be stiffer).

¶ 41 At about 4 a.m., defendant had stopped playing video games, but Jessica continued to play an NBA game. Also, defendant stopped drinking, because he needed to "sober up" before driving home. Jessica continued to drink rum and Diet Coke. They sat together on the couch, with Jessica leaning on his shoulder. Every once in a while, she removed her hand from the game and placed it over defendant's "crotch" (over his pants). Between 3 a.m. and 8 a.m., Jessica placed her hand over his "crotch" multiple times (more than 5 times but less than 15 times). Defendant never told her not to touch him there. The trial court sustained the State's hearsay objection to a question as to what happened around 4 a.m.; prior to the objection, defendant had answered, "Other than us playing video games? We were also playing music and she told me that she had loved me."

¶ 42 At about 5 a.m., defendant got up to take his cup to the kitchen and Jessica followed. He hugged Jessica, and she brought him to the ground by sweeping his leg under him. They were play fighting, and defendant believed they were having fun. He continued hand wrestling and "messing around." Defendant got up, and they ended up facing each other. Jessica grabbed his

shoulders and pushed defendant back, at which point, he slammed his head against a kitchen cabinet door. He thought it was funny. The couple moved to the living room.

¶ 43    Defendant sought to testify that, in the living room, Jessica asked him to put her in a guillotine hold, but the court sustained the State's hearsay objection. Defense counsel proffered that it was a request, not a statement, and was offered to show state of mind; thus, it was not hearsay.

¶ 44    The couple lay on the floor, facing each other and with defendant's head at about Jessica's shoulder level. They hand wrestled, pushing against each other, and Jessica's right leg was draped over defendant's left leg. The couple took 20-minute breaks from wrestling about every 5 or 10 minutes. During a break, defendant put his hand on Jessica's stomach and "started to slowly move it down to her pant level[.]" He testified that they were "playfully flirting" throughout the night and "that some sexual advances had been made." According to defendant, "I was trying to put my hand in her pants to put my fingers in her vagina." He did not put his hand in Jessica's shorts, because she moved her hand to brush his away and defendant put his hand on his side. Jessica did not say anything, nor did defendant.

¶ 45    They continued talking and wrestling. Defendant again tried to put his hand up her shorts, "but I never got fully inside. I had a couple of fingers inside like the short level where shorts would be there and then—" (The shorts line was between his first and second knuckles.) He was attempting to put his fingers in Jessica's vagina, but Jessica brushed away defendant's hand and told him to stop. According to defendant, prior to this time, Jessica had not said "stop" or "no" or "what are you doing." Defendant moved his hand away and started to get up. He testified that he did not make contact with Jessica's vagina or her panty line, though he was unaware if she was wearing panties. Defendant also testified that Jessica did not use any kind of strength to brush

away his hand. Once he started standing, defendant made a joke to try to lighten the situation. He said he was going to go home. Defendant does not believe that he used force to create a sexual encounter. Up until the time Jessica said "no," defendant believed she was a willing participant, because she was play fighting with him and laughing and they were having a good time. She never cried. "[S]he didn't seem visibly or physically upset in any way." Defendant gathered his belongings, gave Jessica a hug, kissed her on the cheek, and said that he was leaving. Defendant left between 6:30 and 7 a.m. At that point, Jessica did not appear to be upset.

¶ 46 A few days later, Lakemoor police contacted defendant, and he went to the police station. He provided oral and written statements. He denied telling officer Francke that his finger was inside of Jessica's vagina for 10 seconds. (This testimony was contrary to the video.) Defendant also testified that his finger was never inside of Jessica's vagina at any point on September 16 or 17. When he told police that he was able to get his hand "up there," he meant Jessica's upper thigh and inside her shorts. By "in there" he meant inside her pant line.

¶ 47 On cross-examination, defendant testified that he spent about three hours at the police station. He had not slept in over 48 hours when he was interviewed. He never told the officer about prior incidences when he would play wrestle and how that would lead to sex. "I was dead asleep at that point." Defendant stated that he did not fully recall everything he told the officer.

¶ 48 Defendant also denied that he tried to get Jessica drunk. He never told police that Jessica was putting her hand on his crotch, because he had forgotten about it and lacked sleep. Defendant testified that he told police that things had gone too far, referring to how *Jessica* perceived it (*i.e.*, she perceived that defendant fingered her). "I felt horrible because of how I ended up making her feel." He denied fingering Jessica and that that is why he felt horrible.

¶ 49    Defendant testified that he wanted and tried to have sex with Jessica, and, "She never explicitly stated" that she did not want to have sex with him.  She swiped his hand away and told him no "at the very end."  Defendant initially denied telling police that Jessica said "no" the whole time, but then testified that "she did not say it the entire night.  She just said it that one time as she brushed my hand away."  When asked if he lied to police, defendant replied, "I don't fully remember what I said at that time, yes."  Defendant asserted that his trial testimony was truthful and that he had a better recollection at trial than during his interview a few days after the incident.  What he told officer Francke was incorrect.  Defendant explained that he spoke to police on September 19, 2018, after coming home from working an overnight shift.  He was "unbelievably tired at that point."

¶ 50    Defendant told officer Francke that he groped Jessica's breasts, but testified that he did not actually do so and made the statement to police, because "I believed what she had told me that I did."  He knows he did not do it, but he admitted to the act, because he felt bad about doing what Jessica claimed he did.  He admitted that, in her texts, Jessica did not mention the groping and the officer did not ask about it; rather, defendant, unprompted, brought it up.  Defendant further testified, "that was the start of the Me Too movement" and "I didn't actually do any of that," but "I felt horrible cause of that whole—the Me Too stuff.  I didn't want to be a part of any of that."  Defendant explained that he turned himself in, because he felt bad about how Jessica perceived what happened and because he was scared.  However, he conceded that he did not first contact the police to turn himself in.

¶ 51    Defendant denied that he told police that Jessica said "no" the *entire* time. When the officer asked defendant if he was fingering Jessica for about 10 minutes, defendant told him it was about 10 seconds.  He explained that he "was alluding to my hand being in her pant line, not actually

fingering her." According to defendant, the officer phrased the question as asking whether defendant had his hand "up there." When the State noted that the officer asked if defendant had penetrated or fingered Jessica, defendant replied, "That's not how I understood it at that time. That's not what I meant to say." Defendant denied fingering Jessica.

¶ 52　Defendant further testified that Jessica was the sexual aggressor "most—fully all of the time."

¶ 53　On re-direct, defendant stated that his reference to 10 seconds meant that his hand was inside the rim of Jessica's shorts at the edge of her panty line, about the bottom of her shorts, for 10 seconds. He did not understand the officer to be asking him about his finger being inside Jessica's vagina. Defendant denied that he did what Jessica alleged he did, but he did not want to call her a liar because he cared deeply for her. When asked if he wrestled with Jessica that day against her will, the trial court sustained the State's objection, determining that the question inquired as to the "mental impression of another."

¶ 54　On re-cross examination, defendant stated that he believed that Jessica thought what he "was doing to her was a big deal." The defense rested.

¶ 55　　　　　　　　B. Trial Court's Ruling and Subsequent Proceedings

¶ 56　The trial court found defendant guilty on all counts. It noted that the issue in the case was the parties' credibility, and it found Jessica's testimony credible and defendant's testimony incredible. The court also mentioned Jessica's text that she kept saying no and to stop, but that defendant kept trying to get in her shorts and did get his finger in her; defendant's response that he was sorry and that it was not okay; defendant's statement to police that he got his hand under Jessica's shorts; and the photographs of Jessica's bruises, which the court found were not "playful bruises." The court further noted that defendant essentially admitted at least part of the offense,

but said he did not mean it because he was too tired to know what he was saying. "I believe that he did know what he was saying." The court found that Jessica said "no" several times. It also took judicial notice of defendant's size ("He's a large man") and Jessica's size and found that, based on the parties' sizes and Jessica's bruises, she was held against her will. It also determined that defendant placed his finger in Jessica's vagina, knowingly fondled her breasts, placed his sex organ on her buttocks, and was guilty of unlawful restraint.

¶ 57 Defendant moved for a new trial, arguing that evidentiary errors, including the barring of his testimony that Jessica invited or consented to defendant to hold her in a head lock (relating to the unlawful-restraint count) and that Jessica told defendant when they met that she enjoyed rough sex, as evidence of specific past consensual acts as giving context to the events on the night in question. On June 25, 2020, the trial court denied defendant's motion, finding that defendant testified as to what the couple's foreplay practice had been; that it had found defendant incredible and Jessica credible; and it noted the text message wherein Jessica wrote that defendant's conduct was not okay and defendant's response that he had gone too far, fingered her, and knew it was wrong.

¶ 58 The court sentenced defendant to four years' imprisonment on the criminal-sexual-assault conviction and two years' conditional discharge on the criminal-sexual-abuse convictions. The court merged the unlawful-restraint conviction into the criminal-sexual-assault conviction. The court also ordered defendant to pay restitution, undergo medical testing, and register as a sex offender. Defendant appeals.

¶ 59                                    II. ANALYSIS

¶ 60     Defendant challenges the sufficiency of the evidence against him and argues that many of the trial court's evidentiary rulings constitute an abuse of discretion.  For the following reasons, we reject his arguments.

¶ 61                              A. Sufficiency of the Evidence

¶ 62     A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  *People v. Collins*, 106 Ill. 2d 237, 261 (1985).  When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis omitted.) *Id.*  (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact.  *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 63     Defendant was found guilty of one count of criminal sexual assault.  As relevant here, a person commits criminal sexual assault if that person commits an act of sexual penetration and uses force or threat of force.  720 ILCS 5/11-1.20(a)(1) (West 2018).  The State alleged that defendant, by use of force, placed his finger in Jessica's vagina.  Defendant was also found guilty of two counts of criminal sexual abuse.  A person commits criminal sexual abuse if that person commits an act of sexual conduct by the use of force or threat of force.  720 ILCS 5/11-1.50(a)(1) (West 2018).  The State alleged that defendant, by use of force, fondled Jessica's breasts and knowingly touched his sex organ to Jessica's buttocks.

¶ 64    Jessica testified that, at around 6 a.m. on September 17, 2018, she was standing in her living room, playing video games. Defendant came up behind her and tried to give her a hug, but she asked him to stop because she wanted to continue playing the game.  Defendant complied, but, about 5 or 10 minutes later, he came up behind her and knocked the controller out of her hand. When Jessica turned around, they got "physical" and defendant tried to take her down.  They ended up on the floor, with Jessica on her hands and knees and defendant behind her.  The couple wrestled, and she tried to get away when defendant tried to keep her legs together.  When defendant tried several times to pull down Jessica's shorts, she said "no, stop" and "what are you doing?" Defendant persisted and put his hand under Jessica's shorts, "maneuvered" her underwear, and used his finger to penetrate her vagina.  She repeatedly asked him to stop, and, when she tried to move, he grabbed her breasts while "thrusting behind me."  Jessica felt defendant's erection near her buttocks.  She continued to ask him to stop, but he did not do so.  This encounter lasted for 10 minutes.

¶ 65    Eventually, they stood up, at which point defendant grabbed Jessica by the neck and held down her head in a hold for about one minute, which choked her.  She was able to push his leg away to make him lose his balance, and they both fell to the floor, with Jessica falling onto her knee and elbow and defendant falling back onto a kitchen cabinet.  Jessica asked defendant several times to leave, and he eventually left.  Photographs depicted scratch marks near her ear and neck area, along with carpet burn marks on her knees and an elbow bruise.

¶ 66    Jessica further testified that she and defendant had on prior occasions play wrestled and had a habit of play fighting.  She denied asking defendant that morning what a guillotine choke was and did not recall "cool wrestling and guillotine holds before that."

¶ 67 Defendant texted Jessica for the next two days, inquiring how she was and if she wanted to get together. Jessica did not respond until Wednesday, September 19, 2018, when she wrote that she "was saying no and to stop and you were still trying to get in my pants and did get in my pants and did get your finger in me all while I was saying no and to stop and turning away. That's not okay." Defendant responded, "I'm sorry [J]ess. I should've realized. I was only being playful. I am very truly sorry" and, "It's not ok."

¶ 68 During the near-contemporaneous police interview, defendant told officer Francke that he "went too far" and would "take her word for it" as to whether his finger penetrated Jessica's vagina. Also, when asked if Jessica was correct that he fingered her for about five minutes, defendant responded, "no," and that it was about 10 seconds at most. When officer Francke stated that defendant had already admitted that "biggest thing," that he had stuck his finger in Jessica's vagina, defendant replied, "yeah." He also stated that, if Jessica stated that he tried to pull down her shorts, then "I must have." Defendant also admitted to groping Jessica's breasts. He also agreed that Jessica "said no" and "she had been saying no." He stated, "I know it was wrong and I feel horrible about it."

¶ 69 During trial, defendant testified that the couple played video games Sunday evening and into the early morning hours on Monday. Jessica flirted with him by touching his crotch multiple times. At about 5 a.m., defendant got up to take his cup to the kitchen, and Jessica followed, hugged him, and swept his leg under him. They play fought, and defendant believed they were having fun. They hand wrestled. When they stood, Jessica grabbed his shoulders and pushed defendant back, at which point his head slammed against a cabinet door. They moved to the living room and eventually got on the floor. They hand wrestled, taking breaks in between. During a break, defendant put his hand on Jessica's stomach and to move it to her pant level, trying to put

his hand in her shorts to put his "fingers in her vagina." According to defendant, they had been "playfully flirting" throughout the night and "some sexual advances had been made." However, he did not put his hand in Jessica's shorts because she brushed his hand away. He subsequently tried again and got his finger inside her shorts, but Jessica again brushed away his hands and told him to stop. He denied that, prior to this time, she had said "stop" or "no" or "what are you doing." Defendant also testified that Jessica did not seem upset. Defendant left.

¶ 70 Defendant denied that he told police that his finger was inside Jessica's vagina for 10 seconds (he meant that his hand was inside the rim of her shorts at the edge of her panty line) and denied he penetrated her vagina with his finger at any point on September 16 or 17, 2018. He had not slept for over 48 hours and does not fully recall what he told the officer. When he stated that things had gone too far, he meant how Jessica perceived it. He denied that he fingered her and that this was the reason he felt horrible. He denied that he did what Jessica alleged he did, but he did not want to call her a liar, because he cared for her. Defendant admitted he told the officer that he groped Jessica's breasts, but testified that he did not actually do so. He made the statement to police because he believed what Jessica said. He conceded that, in the text exchanges, he, not Jessica, brought up the groping. When asked if he lied to police, defendant testified both that he does not fully remember what he said and that what he told the police was incorrect.

¶ 71 We conclude that the evidence was sufficient to sustain defendant's convictions. Defendant's statements and testimony were inconsistent, and the trial court found his testimony incredible on the key issues of whether he penetrated Jessica's vagina, groped her breasts, and touched her buttocks with his sex organ. We will not disturb that finding. *Cooper*, 194 Ill. 2d at 431. His replies to Jessica's text message that he put his finger in her vagina while she kept saying "no" contain apologies, not denials. He texted that he was sorry and ashamed of himself and he

promised never to do it again. He even stated that he wanted to bring himself to the police, which he did not do. During his interview, defendant admitted to two of the charged acts. He admitted to putting his finger in Jessica's vagina and fingering her for about 10 seconds and he admitted to groping her breasts. Also, during the interview, he corroborated Jessica's testimony that she kept saying "no" to his conduct.

¶ 72    Again, we conclude that any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found defendant guilty. We reject defendant's argument that no crime occurred and that the nature of the couple's relationship—physical foreplay/rough sex prior to sexual relations—explained what transpired on the night in question. The evidence showed that the couple liked to wrestle or have rough foreplay, not that Jessica consented to vaginal penetration or the groping of her breasts when she repeatedly asked defendant to stop. Defendant claims that his text apologies reflect that he did not believe he did anything wrong and do not constitute an admission of guilt. We believe that they and the evidence as a whole shows otherwise. Defendant's contemporaneous texts and interview statements corroborate Jessica's version of the events. A rational factfinder would have discounted his denials at trial. Defendant maintains that he is not arguing that he had the right to force himself on Jessica simply because they had engaged in sexual intercourse in the past. Rather, he contends that he showed that, because of their prior sexual practices and routine, always initiated by Jessica, he reasonably believed that Jessica desired to have sexual intercourse on the night in question, until he understood that she did not and at which point he stopped. Defendant ignores that Jessica testified that she repeatedly said "no," and that he admitted to officer Francke that Jessica "had been saying no." Defendant wishes to discount the admissions to officer Francke, asserting that he made them, because he did not wish to call Jessica a liar. This is incredible, as a reasonable person would not admit to a crime that is

punishable with prison time merely to avoid casting doubt on his accuser or because that is what his accuser "perceived" occurred. Furthermore, we note that defendant admitted, unprompted, during the interview that he groped Jessica's breasts, but, at trial, denied that he did so while also claiming that he told officer Francke that he did because he believed Jessica when she said he did so. However, as the State notes, Jessica, in her texts to defendant, never accused him of groping her breasts. Further, at trial, defendant initially testified that Francke brought up the groping.

¶ 73    In summary, the evidence was sufficient to sustain the convictions for criminal sexual abuse and criminal sexual assault.

¶ 74                                B. Evidentiary Rulings

¶ 75    Defendant argues next that the trial court abused its discretion by barring testimony from both himself and Jessica that Jessica consented to the sexual interaction that occurred, if any. Specifically, defendant contends that the court erred in barring Jessica from testifying on cross-examination that she had asked defendant to place her in a choke hold on prior occasions and that it erred in limiting defendant's testimony concerning the same. The court, defendant asserts, erred in refusing to allow defendant to impeach Jessica and demonstrate that she asked to be choked. Defendant also challenges several other evidentiary rulings, argues that the cumulative effect of the court's errors warrants reversal, and contends the errors deprived him of his sixth amendment right to confront and cross-examine his accuser (U.S. Const., Amend. VI; Ill. Const. 1970, Art. I, § 8).

¶ 76    The State first responds that we have jurisdiction only over the counts on which the court sentenced defendant—criminal sexual assault and criminal sexual abuse—and not unlawful restraint. We agree. See *People v. Caballero*, 102 Ill. 2d 23, 51 (1984) (holding that a defendant may only appeal convictions for which a sentence has been imposed); *People v. Olaska*, 2017 IL

App (2d) 150567, ¶ 112-15 (following *Caballero* and restricting review to the convictions on which the defendant was sentenced and noting the content of the defendant's notice of appeal). The State asserts that the evidence was sufficient to establish defendant's guilt on the sentenced counts. Second, the State argues that several of defendant's arguments are forfeited and that any alleged errors do not constitute plain error or are harmless beyond a reasonable doubt.

¶ 77    We review evidentiary rulings for an abuse of discretion. *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 82. A trial court abuses its discretion where its decision is unreasonable. *Id.*

¶ 78                    1. Jessica's Testimony and the Constitutional Claim

¶ 79    On appeal, defendant argues that the trial court abused its discretion in limiting or barring Jessica's testimony: (1) that she had asked defendant to place her in a choke hold on multiple occasions prior to the night of the incident (and other references to their rough sex); (2) that she told defendant on their first date that she did not use birth control and that he would have to have a condom at all times; (3) that defendant was trying to figure out how to do certain wrestling moves on the night in question; (4) as to how many times the couple had sex; and (5) as to how the play fighting began, *i.e.*, whether it was her idea; and (6) whether defendant had ever tried to hug her goodbye.

¶ 80    The State contends that defendant's challenges to the limitations on Jessica's testimony are forfeited, because defendant did not include them in his posttrial motion. In his posttrial motion, defendant challenged the trial court's rulings excluding *his own* testimony about the couple's ground rules and rough play/sex and about Jessica asking him to put her in a choke hold so that she could try to get out of it. We agree with the State that defendant forfeited any challenge to the limitations on Jessica's testimony. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (issue is forfeited

on review if it is not raised both at trial and in a posttrial motion). For the same reason and because he did not raise the issue at trial, we conclude that his constitutional claim is forfeited. See *People v. Burnett*, 2015 IL App (1st) 133610, ¶¶ 72, 76-79 (where the defendant objected to a statement at trial on ground that it did not fit any hearsay exceptions, the constitutional-issue exception did not apply to his claim on appeal that, by admitting the statement into evidence, his sixth amendment right to confront and cross-examine witnesses against him was violated).

¶ 81 Defendant next argues that, if we find the challenges to Jessica's testimony forfeited, we should review his claims under the plain-error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) (forfeited issue may not be considered on appeal, unless there was plain error). Further, in his reply brief, defendant argues for the first time that his constitutional claim may also be reviewed for plain error. A defendant may raise a plain-error argument for the first time in his or her reply brief. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). Thus, we will address his argument.

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him [or her]. *** In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [*People v. Keene*, 169 Ill. 2d 1, 17 (1995).] Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) [*People v.*

*Blue*, 189 Ill. 2d 99, 138 (2000).] In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 82 The defendant must first establish that a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 497-98 (2009). " '[T]he plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed.' " (Emphasis in original.) *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (quoting *People v. Hampton*, 149 Ill. 2d 71, 102 (1992)).

¶ 83 We conclude that, even if there was error concerning either the rulings as to Jessica's testimony or the constitutional claim, there was no plain error under either prong of the doctrine. Addressing the first prong, defendant contends that the evidence was very closely balanced and that the issue, thus, becomes whether the guilty verdicts may have resulted from the errors. He argues that they did because, whether Jessica had consented in the past to rough sex and invited defendant to choke her on the night in question "was the issue in the case." To properly evaluate the parties' credibility, he asserts, the court should have allowed defense counsel to explore their routine prior to the night of the incident, and defendant should have been allowed to testify that Jessica asked him to choke her during the incident about which she later complained.

¶ 84 We reject this argument. The evidence against defendant was overwhelming. This case does not merely involve two witnesses with conflicting testimony, a scenario that is generally characterized as presenting a close case. See *Edwards v. Hill-Thomas Lime & Cement Co.*, 378 Ill. 180, 183 (1941) ("The above reference to the conflicting testimony, and the respective theories and contentions of the parties on the record, demonstrates that the case was close on the facts and was one which the jury might have decided either way."). Rather, here, we have the added elements of: (1) defendant's contemporaneous apology text messages; and (2) his near-

contemporaneous videotaped admissions to police (which were consistent with Jessica's version of the incident). This evidence rendered incredible his trial denials, especially when considered in conjunction with his attempt to explain the inconsistencies between his trial denials and his contemporaneous admissions—specifically, that he chose to lie (and face potential incarceration) because he did not want to paint Jessica as a liar and that he felt horrible because of what Jessica "perceived" happened. His attempted explanation was unbelievable and reflects a self-serving desperation to avoid punishment. Given defendant's lack of credibility and the consistency between Jessica's version of the events and defendant's admissions, we can only conclude that the evidence against defendant was overwhelming.

¶ 85    As to prong two, defendant argues that the court's limitations on the presentation of the evidence constituted a structural error. Defendant contends that, although it can be assumed that the barred facts involved sensitive and potentially embarrassing matters, this was not a justification for prohibiting him from presenting the court with the totality of the circumstances. Courts, he maintains, cannot refuse to hear evidence that some may deem distasteful at the cost of a defendant's right to present his or her case at a fair trial. We reject this argument. An error is generally considered structural when it renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence. *People v. Glasper*, 234 Ill. 2d 173, 196 (2009). The United States Supreme Court has found structural error in a limited class of cases, including those involving complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable-doubt instruction. *People v. Thompson*, 238 Ill. 2d 598, 609 (2010) (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). Our supreme court has noted that plain error is *not* restricted to the types of structural errors recognized by the Supreme Court. It has held that the

failure to apply the one-act, one-crime rule and the failure to exercise discretion in denying a request for a continuance constituted second-prong plain error. See *People v. Clark*, 2016 IL 118845, ¶ 25 (citing cases). Here, we cannot conclude that any error in excluding Jessica's testimony concerning their rough sex and her request to be put in a choke hold rose to the level of second-prong plain error.

¶ 86                        2. Defendant's Testimony

¶ 87    Defendant also argues that the court abused its discretion in excluding his own testimony that Jessica: (1) on their first date, set forth the ground rules for their relationship and that she enjoyed rough sex and rough play; (2) on the night in question, requested to be placed in the choke hold so that she could try to get out of it; and (3) said she loved him on the night at issue but had expressed dissatisfaction with their relationship around July 4, 2018, and made certain other statements, including asking defendant to bring a bottle of rum on the night in question and her statement after slamming defendant into a cabinet door that night. Further, defendant contends that, if any of the errors are forfeited, the plain-error doctrine applies to allow us to address the errors.

¶ 88    Defendant raised the ground-rules testimony in his posttrial motion, but, during trial, he did not make an offer of proof as to what the couple's alleged ground rules were so that the trial court could assess the relevance and admissibility of defendant's testimony. We agree with the State that this issue is, therefore, forfeited. See *People v. Wood*, 341 Ill. App. 3d 599, 604 (2003) (exclusion of evidence at trial is unreviewable on appeal unless a formal offer of proof was made below; offer of proof permits the reviewing court to determine whether the evidence was properly excluded; proponent must establish testimony's admissibility); see also *People v. Andrews*, 146 Ill. 2d 413, 421 (1992) (it is insufficient for the proponent to speculate as to the witness's testimony

or merely summarize the testimony in a conclusory fashion; rather, the proponent "must explicitly state what the excluded testimony would reveal and may not merely allude to what might be divulged by the testimony"). Because we do not have a record from which to determine whether defendant's testimony on the topic should have been admitted, we do not reach the issue.

¶ 89    Turning to the choke-hold testimony, at trial, defense counsel made an offer of proof that defendant would testify that Jessica asked him to put her in a guillotine hold on the night in question and that this went to defendant's state of mind. Counsel twice mentioned that the testimony was relevant to the unlawful restraint count. The trial court sustained a hearsay objection, admonishing defense counsel that "you are offering it as proof of the truth of the matter that you are asserting by a witness who you had a chance to cross examine, but did not."

¶ 90    Here, defendant argues that the court had forgotten Jessica's cross-examination testimony denying that she had demanded a choke hold. He also notes Jessica's testimony that defendant choked her against her will. Defendant argues that, because counsel had confronted Jessica with the same questions, defendant was entitled to answer them to impeach her. He maintains that, when considered in the context of the consent issue, refusing to allow him to impeach Jessica and demonstrate that she asked to be choked is erroneous and defies logic and common sense. In the alternative, defendant argues that, even if his testimony was not admissible for impeachment purposes, it was admissible through the effect-on-the-listener exception to the hearsay rule, the state-of-mind exception, and the completeness doctrine.

¶ 91    The State responds that any error in excluding the testimony was harmless. We agree and conclude that any error in barring the choke hold testimony was harmless beyond a reasonable doubt. An evidentiary error is harmless beyond a reasonable doubt if there is no reasonable probability that the jury would have acquitted the defendant absent the error. *In re E.H.*, 224 Ill.

2d 172, 180 (2006). Whether the erroneous exclusion of evidence is harmless beyond a reasonable doubt may be decided by considering whether: (1) the error contributed to the conviction; (2) the other evidence presented overwhelmingly supported the conviction; or (3) the evidence that was excluded was duplicative or cumulative of that admitted. *People v. Tabb*, 374 Ill. App. 3d 680, 690 (2007). First, the barred testimony did not contribute to the convictions for which defendant was sentenced. As noted, the choke-hold testimony was relevant to the unsentenced unlawful restraint count. Indeed, defense counsel twice mentioned this point. Second, as we determined above, the other evidence of defendant's guilt was overwhelming. Third, the barred choke hold testimony was cumulative to evidence that was admitted. Specifically, in his written statement, defendant stated that, after he hit his head in the kitchen, the couple stood up and Jessica asked him to show her a guillotine hold. He demonstrated it but did not "squeeze hard."

¶ 92    Next, as to defendant's arguments concerning his testimony that Jessica expressed that she loved him on the night at issue and other testimony, we conclude that his challenges to this evidence are forfeited because he failed to raise them in his posttrial motion.

¶ 93    Finally, we conclude, for the reasons stated above, that, even if the court erred as to any rulings concerning defendant's testimony, the plain error doctrine does not apply to allow us to address such errors. The evidence was not close and the errors were not so serious that it affected the fairness of defendant's trial or challenged the integrity of the judicial process.

¶ 94                              3. Cumulative Error

¶ 95    Defendant final argument is that the cumulative effect of the court's errors denied him a fair trial and reversal is warranted. The only issue that defendant specifically raises in this portion of his brief that is not forfeited is the choke-hold testimony. As this constitutes a single unavailing issue, there is no cumulative error argument to be made.

¶ 96                          III. CONCLUSION

¶ 97    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 98    Affirmed.