No. 2-23-0013
Order filed February 1, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-928 |
| | ) | |
| KEVIN F. GRAF, | ) | Honorable |
| | ) | James S. Cowlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court did not err in dismissing defendant's postconviction petition at the second stage.  Affirmed.

¶ 2    After a bench trial, defendant, Kevin F. Graf, was convicted of one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)), two counts of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2018)), and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2018)).  He was sentenced to four years' imprisonment on the criminal-sexual-assault conviction and two years' conditional discharge on the criminal-sexual-abuse convictions.  The circuit court merged the unlawful-restraint conviction into the criminal-sexual-assault conviction.  Defendant

was ordered to pay restitution, undergo medical testing, and register as a sex offender. On direct appeal, defendant challenged the sufficiency of the evidence against him and numerous evidentiary rulings. This court affirmed. *People v. Graf*, 2021 IL App (2d) 200406-U.

¶ 3 On June 21, 2022, defendant filed a postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The petition advanced to the second stage, and the circuit court dismissed the petition. Defendant appeals, arguing that the circuit court erred in dismissing his petition, where (1) he made a substantial showing of actual innocence, because new evidence and information not previously presented to the court concerning the victim's relationship with another man was discovered that in probability would have changed the outcome of the case; (2) he established that his constitutional rights to due process and a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated, where the prosecution withheld evidence of the victim's accusations and investigation against another man; (3) he made a substantial showing that he was denied effective assistance of trial counsel, where counsel failed to present available evidence concerning a forensic examination of defendant's phone records and to preserve evidentiary and constitutional errors for appeal; and (4) he established that his rights under *Brady* were violated, where the State withheld the results of the forensic evaluation of his phone records. We affirm.

¶ 4                                  I. BACKGROUND

¶ 5 The State alleged that, on September 17, 2018, defendant committed criminal sexual assault, where, by use of force, he stuck his hand up Jessica V.'s shorts and digitally penetrated her vagina. It further alleged that defendant committed two counts of criminal sexual abuse, where, by use or threat of force, he, either directly or through clothing, knowingly fondled Jessica's breasts and touched his sex organ to her buttocks. Finally, the State alleged that defendant committed

unlawful restraint, where he, knowingly and without legal authority, grabbed Jessica from behind and placed her in a headlock and held her to the floor.

¶ 6                                     A.  Trial

¶ 7      At trial, Jessica testified that she met defendant in April 2018 via a dating app, they started out as friends, and, shortly thereafter, started "casual dating."  On Sunday, September 16, 2018, she and defendant went to Sweet Melissa's bar in Lakemoor, where they watched a football game and had a "couple" of drinks.  They left the bar at 5:30 p.m. and went to Jessica's home, where they played video games until the following morning.

¶ 8      At about 6 a.m. on Monday, September 17, 2018, Jessica stood, playing video games in front of her television, and defendant watched her play.  Defendant then came up behind her and tried to give her a bear hug, but Jessica asked him to stop because she wanted to play the game. Defendant sat back down on the couch.  He watched Jessica play for about 5 or 10 minutes and then came up behind her and knocked the game controller out of her hand.  Jessica turned around, and "it turned into like physical[ly] going at me to try and like take me down, and I turned around and tried to not let that happen and we had got onto the ground, carpet area[.]"  Jessica was on her hands and knees, and defendant was behind her.  They wrestled, defendant tried to keep both of Jessica's legs together, and she tried "to maneuver out."  Defendant held up Jessica's left arm, and, with his other arm, he tried to put her in a hold.  He then tried several times to pull down Jessica's shorts.  According to Jessica, she said, "several times," "Kevin, no, stop" and "Kevin, what are you doing?"  She kept trying to pull up her shorts.  Defendant then:

> "went into my shorts from below and then maneuvered my underwear and started
>
> to penetrate me [with his finger] in my vaginal area and I was asking him to stop, and any
>
> time I tried to move my hips or legs, then he would go and grab my breast area, all while

he was thrusting behind me and I'm just hearing him breathing and I was asking him to stop and he's not stopping." Defendant penetrated her for about 10 minutes, and he kept thrusting and trying to hold down Jessica's left arm to keep her on her stomach on the carpet. She felt his erection near her "butt" area.

¶ 9    Jessica turned onto her knees and stood. Defendant also stood, grabbed her by the neck, had her head down into a hold (for about one minute), and started to choke her. Jessica testified that she felt that she could not breathe and that things got "black and foggy." She put her right leg behind defendant's leg and tried to make him lose his balance. They both fell, because defendant continued to hold onto Jessica's neck. Jessica fell onto her knee and elbow, and defendant fell back into the closet area in her kitchen. Jessica asked defendant to leave several times and told him that she was going to call the police. Defendant left.

¶ 10    About two hours later, at around 8:30 a.m., defendant texted Jessica. She did not respond. The next day, defendant texted her again, and she did not respond. On Wednesday, September 19, 2018, defendant texted Jessica again, and she responded. He never tried to call her.

¶ 11    Also on Wednesday, Jessica went to the police and showed them the text messages. The police took photographs of Jessica. She stated that they depicted scratch marks near her ear and neck areas and testified that she sustained injuries while defendant was choking her. Another photograph depicted burn marks on her knees that she testified she sustained trying to get away from defendant. Jessica also described a bruise on her elbow that she sustained when she and defendant fell after she used her leg to make him lose balance.

¶ 12    Jessica denied laying down sexual "ground rules" when she and defendant started dating in May 2018. She also denied that they had a habit of play fighting. When asked if she wrestled

with defendant, she replied, "We played sports and, yeah, we like playfully in the—in like the living room area, yes[.]" Jessica could not recall the first time that she play wrestled with defendant. Jessica could not recall the first time she had sex with defendant, but it was probably the end of May or beginning of June 2018. She could not recall if she play fought with him that first time they had sex.

¶ 13    Lakemoor police officer Eric Francke testified that, on Wednesday, September 19, 2018, he responded to a dispatch at the police department to meet with Jessica, who wanted to make a report about being sexually assaulted by defendant. Another officer took photographs of the bruising on Jessica's body. Officer Francke took photos of her text messages, and Jessica provided a written statement.

¶ 14    On September 20, 2018, officer Francke went to defendant's house and asked defendant to come to the police department to talk. Defendant complied. Defendant was placed in an interview room, and the interview was audio and video recorded. The recording was entered into evidence and played.

¶ 15    Officer Francke testified that defendant told him that the couple was having drinks at Sweet Melissa's and watching football. Afterward, they went to Jessica's house to hang out and play video games. In the morning, defendant tried to wrestle with Jessica "and was wrestling as he said they always do and that it got into where he digitally penetrated her and grabbed her and held her." Defendant told officer Francke that he put Jessica in a head lock with her head in his elbow and pulled her down and tried to pull off her shorts. Defendant also stated that Jessica told him to "let go" and "no." They continued to wrestle and, eventually, defendant got up and left. Defendant tried to contact Jessica several times afterward via text messages and phone calls, but she did not respond until Wednesday. Defendant showed officer Francke the text messages on his phone, and

Francke took photos of the messages, which were admitted into evidence. Defendant also agreed to provide a written statement, which was also admitted into evidence.

¶ 16    On cross-examination, officer Francke testified that, when defendant stated during the interview that he knew he got his "hand in there," Francke did not ask him what he meant by "there," because he was already relating having his hand up Jessica's shorts. Francke understood defendant to mean the shorts and Jessica's vagina. Further, the closest defendant came to admitting he digitally penetrated Jessica's vagina was when he said, "If Jessica said I did, I probably did." When shown a copy of his report and asked where it stated that defendant admitted he put his finger in Jessica's vagina, officer Francke stated, "I'm sorry, this is where I thought it was, but I had put in here that he said that he probably did." Defendant was very cooperative during the interview.

¶ 17    On re-direct, officer Francke testified that defendant denied that he "fingered" Jessica for five minutes, as Jessica had stated, and he said that it was only for about 10 seconds. Defendant stated that his hand went up Jessica's shorts.

¶ 18    During the interview, defendant admitted that he put his finger in Jessica's vagina. Defendant stated that "I guess I went too far." He was trying to "finger" Jessica, and she said no. "I know it's wrong," and "I feel horrible about it." Defendant also stated, "I will take her word for it," in reference to whether his finger penetrated her vagina. When asked if he tried to pull down Jessica's shorts, defendant responded that, if Jessica said he did, then "I must have." When officer Francke stated that defendant had already admitted the "biggest thing," that he had stuck his finger in Jessica's vagina, defendant replied, "yeah." Defendant also admitted, unprompted, to groping Jessica's breasts. He also agreed that Jessica "said no" and "she had been saying no." "I know it was wrong and I feel horrible about it." He could not recall everything that transpired that evening

because he was tired and had "polished off a bottle of Jameson." "If she says she got my hand away, I fully believe her story[.]" Defendant stated that he had his "wires crossed" and, thus, did not react appropriately to Jessica's rejections.

¶ 19    In his written statement, defendant wrote that, after he hit his head in the kitchen, the couple stood and that Jessica asked him to show her a guillotine hold. He demonstrated it, but wrote that he did not "squeeze hard." They had flirted all night and, once they moved to the living room, they laid on the floor and play wrestled. Defendant tried to "play with her" while they wrestled. Jessica did not indicate that anything was "unwarranted."

> "I got my hands down to her pants and attempted to take them down a little bit. No skin was showing. I then moved my hand down below her shorts and put one finger between her shorts and vagina. I do not believe any penetration happened at that point. She pushed my hand away and asked me to stop. I did and we both got up and went back to her kitchen where she told me I should go and get some rest before work."

Defendant sent Jessica a text after he arrived home, and she did not reply to it. He sent more texts in the following days and received no responses to those texts. He asserted that he has "never physically harmed or threatened to commit physical harm" to Jessica. On September 19, 2018, Jessica texted defendant that his actions were "unwarranted, to which I replied how sorry I was and how truly devastated I was with that knowledge."

¶ 20    Defendant sent Jessica several texts in the days after the incident. At 9:35 a.m. on Wednesday, September 19, 2018, Jessica sent her first text response, writing, "Kevin I was saying no and to stop and you were still trying to get in my pants and did get in my pants and did get your finger in me all while I was saying no and to stop and turning away. That's not okay." Defendant responded, "I'm sorry [J]ess. I should've realized. I was only being playful. I am very truly

sorry[,]" "It is not ok. I'm so sorry. I'm ashamed of my self now[,]" and "There's nothing I can do to make up for that. I'm so so sorry. I understand if you can't forgive me. I don[']t deserve it[,]" and "I'm horrified and disgusted with myself. I've never done anything like that before, and I'm going to always continue to strive to never do anything that stupid again. I'm sorry Jessica. I'll stop now. I never meant to hurt you." Jessica replied, "It's not playful when I am trying to pull my pants up, trying to block your hand, saying no and to stop, and then you went from the bottom of my shorts anyway[.]" Defendant responded, "I know. I'm so sorry Jess. It's something I've never done and will never do again. I hate myself for this. There's no excuse for it at all. I'm disgusted with myself and how I carried on. I know there's no foregiveness for this. Fuck I hate myself now. I know. I want to bring myself in to the police because of this. This is horrible and I feel horrible."

¶ 21    During his testimony, defendant, age 27, stated that his first date with Jessica was on May 12, 2018, and, during the date, she brought up the "ground rules." On their second or third date, in late May, they wrestled. They had fun. One week later, they wrestled again in Jessica's apartment. They had fun. Defendant testified about their first two sexual encounters, explaining that they were preceded by play wrestling. He stated that at no point in their relationship did Jessica state that she did not want to play wrestle with defendant. Nearly every time, she initiated the play wrestling, and she asked defendant what a choke hold was and how to get out of it.

¶ 22    On Monday, September 17, 2018, at about 5 a.m., defendant got up to take his cup to the kitchen and Jessica followed. He hugged Jessica, and she brought him to the ground by sweeping his leg out from under him. They were play fighting, and defendant believed they were having fun. He continued wrestling and "messing around." Defendant got up, and they ended up facing each other. Jessica grabbed his shoulders and pushed defendant back, at which point, he slammed

his head against a kitchen cabinet door. He thought it was funny. The couple moved to the living room.

¶ 23    The couple lay on the floor, facing each other and with defendant's head at about Jessica's shoulder level. They hand wrestled, pushing against each other, and Jessica's right leg was draped over defendant's left leg. The couple took 20-minute breaks from wrestling about every 5 or 10 minutes. During a break, defendant put his hand on Jessica's stomach and "started to slowly move it down to her pant level[.]" He testified that they were "playfully flirting" throughout the night and "that some sexual advances had been made." According to defendant, "I was trying to put my hand in her pants to put my fingers in her vagina." He did not put his hand in Jessica's shorts, because she moved her hand to brush his away and defendant put his hand on his side. Jessica did not say anything, nor did defendant.

¶ 24    They continued talking and wrestling. Defendant again tried to put his hand up her shorts, "but I never got fully inside. I had a couple of fingers inside like the short level where shorts would be there and then—" (The shorts line was between his first and second knuckles.) He was attempting to put his fingers in Jessica's vagina, but Jessica brushed away defendant's hand and told him to stop. According to defendant, prior to this time, Jessica had not said "stop" or "no" or "what are you doing." Defendant moved his hand away and started to get up. He testified that he did not make contact with Jessica's vagina or her panty line, though he was unaware if she was wearing panties. Defendant also testified that Jessica did not use any kind of strength to brush away his hand. Once he started standing, defendant made a joke to try to lighten the situation. He said he was going to go home. Defendant does not believe that he used force to create a sexual encounter. Up until the time Jessica said "no," defendant believed she was a willing participant, because she was play fighting with him and laughing and they were having a good time. She never

cried. "[S]he didn't seem visibly or physically upset in any way." Defendant gathered his belongings, gave Jessica a hug, kissed her on the cheek, and said that he was leaving. Defendant left between 6:30 and 7 a.m. At that point, Jessica did not appear to be upset.

¶ 25 A few days later, Lakemoor police contacted defendant, and he went to the police station. He provided oral and written statements. He denied telling officer Francke that his finger was inside of Jessica's vagina for 10 seconds. (This testimony was contrary to the video.) Defendant also testified that his finger was never inside of Jessica's vagina at any point on September 16 or 17. When he told police that he was able to get his hand "up there," he meant Jessica's upper thigh and inside her shorts. By "in there" he meant inside her pant line.

¶ 26 On cross-examination, defendant testified that he spent about three hours at the police station. He had not slept in over 48 hours when he was interviewed. He never told the officer about prior incidences when he would play wrestle and how that would lead to sex. "I was dead asleep at that point." Defendant stated that he did not fully recall everything he told the officer.

¶ 27 Defendant told officer Francke that he groped Jessica's breasts, but testified that he did not actually do so and made the statement to police, because "I believed what she had told me that I did." He knows he did not do it, but he admitted to the act, because he felt bad about doing what Jessica claimed he did. He admitted that, in her texts, Jessica did not mention the groping and the officer did not ask about it; rather, defendant, unprompted, brought it up. Defendant further testified, "that was the start of the Me Too movement" and "I didn't actually do any of that," but "I felt horrible cause of that whole—the Me Too stuff. I didn't want to be a part of any of that." Defendant explained that he turned himself in, because he felt bad about how Jessica perceived what happened and because he was scared. However, he conceded that he did not first contact the police to turn himself in.

¶ 28    The circuit court found defendant guilty on all counts.  It noted that the issue in the case was the parties' credibility, and it found Jessica's testimony credible and defendant's testimony incredible.  The court also mentioned (1) Jessica's text that she kept saying no and to stop, but that defendant kept trying to get in her shorts and did get his finger in her; (2) defendant's response that he was sorry and that it was not okay; (3) defendant's statement to police that he got his hand under Jessica's shorts; and (4) the photographs of Jessica's bruises, which the court found were not "playful bruises."  The court further noted that defendant essentially admitted at least part of the offense, but said he did not mean it because he was too tired to know what he was saying.  "I believe that he did know what he was saying."  The court found that Jessica said "no" several times.  It also took judicial notice of defendant's size ("He's a large man") and Jessica's size and found that, based on the parties' sizes and Jessica's bruises, she was held against her will.  It also determined that defendant placed his finger in Jessica's vagina, knowingly fondled her breasts, placed his sex organ on her buttocks, and was guilty of unlawful restraint.

¶ 29                           B.  Direct Appeal

¶ 30    On direct appeal, this court affirmed.  *Graf*, 2021 IL App (2d) 200406-U.  We (1) rejected defendant's challenge to the sufficiency of the evidence; (2) rejected his challenge to many evidentiary rulings on the basis that they were forfeited for failing to be raised in his posttrial motion; (3) rejected his plain-error argument on the bases that the evidence against him was overwhelming and did not constitute prong two plain error; (4) rejected his argument concerning limitations on his testimony on the basis that he did not make an offer of proof; (5) concluded that any error in excluding certain choke-hold testimony was harmless; and (6) rejected his cumulative error argument.

¶ 31                    C.  Postconviction Proceedings

¶ 32   On June 21, 2022, defendant filed a postconviction petition, arguing that (1) he was innocent of the crimes for which he was convicted because new evidence concerning Jessica's relationship with another man has been discovered that in all probability would have changed the outcome of the trial; (2) the prosecution violated *Brady* by failing to disclose new evidence concerning Jessica's relationship with another man; (3) he was denied effective assistance of trial counsel, where, among other arguments, counsel failed to offer and admit available evidence concerning a forensic examination of defendant's phone records; and (4) the prosecution violated *Brady* by failing to disclose the phone records.

¶ 33   As to his actual-innocence allegations, defendant asserted that he had discovered that Jessica was harassing another man, Brandon Fuchs, at the time of defendant's trial and had sought a stalking/no-contact order against him (a copy of which was attached to his petition). Defendant characterized Jessica's allegations against Fuchs as "nonsensical accusations" that displayed mental health and credibility issues and argued that her actions against Fuchs mirrored those against him and undercut her credibility.

¶ 34   Jessica's petition, filed on March 9, 2020, in the circuit court (case No. 2020OP153), asserted that, between February 27, 2020, and March 8, 2020, Fuchs tracked her messages and whereabouts. He also claimed, per a coworker, that he was Jessica's boyfriend and lost his virginity to her. Jessica also related purchasing a Monster-brand caffeine drink at work and that Fuchs told her over the phone and via text that he owed her for the drink because he felt bad that he kept her up. She asserted that she told no one about purchasing the caffeine drink, and, when she asked Fuchs about it, he stated that he did not know; he was not at work that day. Jessica also stated that Fuchs tracked her activities at work on days he did not go to work; she changed the SIM card on her phone to prevent him from tracking her; and she believed he had access to her Gmail

account. On March 9, 2020, the trial court found that Jessica had not presented credible evidence to meet the statutory burden of proof for an emergency stalking/no-contact order, and it set the case for hearing on March 23, 2020. In March, the court dismissed the petition for want of prosecution. Neither Jessica nor Fuchs was present in court.

¶ 35 Defendant also alleged that new information was provided by Fuchs.[1] Specifically, Fuchs reported that he worked with Jessica at Walgreens, and they developed a social relationship. After a sexual encounter, Fuchs referred to himself as Jessica's boyfriend, but she became hostile upon hearing this and stated that he was not her boyfriend. Jessica broke off contact with Fuchs and attempted to get him fired from Walgreens. The foregoing, defendant argued, showed that there was a pattern to Jessica's behavior, and she was not credible.

¶ 36 In his first *Brady* claim, defendant argued that the Lakemoor police were aware of Jessica's allegations against Fuchs but did not disclose them to defendant so that he could proceed with posttrial motions. In his ineffective-assistance claim, defendant argued that trial counsel became aware of a forensic analysis that had been performed on defendant's phone (containing over 7000 text messages between defendant and Jessica) but relied on the State's representation that there was nothing exculpatory in the data and did not independently investigate the issue. Finally, in his second *Brady* claim, defendant argued that his rights were violated because the State did not disclose the results of the forensic evaluation of his phone, asserting that the results constituted material, favorable evidence that would have supported his defense at trial.

_____

[1]In the petition, postconviction counsel asserted that Fuchs would sign an affidavit reflecting such information. Subsequently, defendant attached such affidavit, dated June 23, 2022, to his response to the State's motion to dismiss his petition.

¶ 37    On September 13, 2022, the circuit court determined that defendant's ineffective-assistance claim stated the gist of a constitutional violation, and the petition advanced to stage two. The State, on September 19, 2022, moved to dismiss defendant's petition, and, on December 15, 2022, the circuit court dismissed the petition at the second stage. Defendant appeals.

¶ 38                                    II. ANALYSIS

¶ 39    Defendant argues that the circuit court erred in dismissing his petition, where (1) he made a substantial showing that he is actually innocent of the crimes for which he was convicted, because new evidence and information not previously presented to the court has been discovered that in probability would have changed the outcome of the case; (2) he established a *Brady* violation, where the prosecution withheld evidence of Jessica's accusations and investigation against Fuchs; (3) he made a substantial showing that he was denied effective assistance of trial counsel, where counsel failed to present readily available evidence concerning his phone records and to preserve evidentiary and constitutional errors for appeal; and (4) he established a *Brady* violation, where the State withheld the results of the forensic evaluation of his phone records. For the following reasons, we reject defendant's arguments.

¶ 40    The Act allows a criminal defendant to attack a prior conviction by establishing that it was the result of a substantial deprivation of rights afforded by the United States or Illinois constitutions. 725 ILCS 5/122-1(a)(1) (West 2020). It establishes a three-stage process for the adjudication of postconviction petitions. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the circuit court independently assesses the petition to determine whether the allegations contained in it, when liberally construed and taken as true, present the gist of a constitutional claim. *Id.* If so, the petition advances to the second stage, where counsel is appointed to represent the

defendant and, if necessary, to file an amended petition. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996); 725 ILCS 5/122-4, 122-5 (West 2020).

¶ 41    At the second stage, the State must either move to dismiss or answer the claims in the petition. *Gaultney*, 174 Ill. 2d at 418. Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will that claim proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2020). The court engages in no fact-finding or credibility determinations at the second stage but takes as true all allegations not affirmatively rebutted by the record. *People v. Dupree*, 2018 IL 122307, ¶ 29. It is concerned with "the legal sufficiency of the petition's well-pled allegations of a constitutional violation"—*i.e.*, whether the allegations "if proven at an evidentiary hearing, would entitle [the] petitioner to relief." (Internal quotation marks omitted.) *Id.*

¶ 42    A postconviction proceeding is a collateral attack on a prior conviction that permits defendants to challenge their convictions or sentences based on actual innocence or a substantial violation of their federal or state constitutional rights. *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010). Postconviction claims are limited to matters that were not and could not have been previously adjudicated. *Id.* Our review of the dismissal of a postconviction petition at the second stage is *de novo*. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 43                              A. Actual Innocence

¶ 44    Defendant argues first that the circuit court erred in dismissing the petition, where he made a substantial showing of actual innocence based on new, material, and conclusive evidence that would probably change the result on retrial. He points to (1) Jessica's "manifesto" (*i.e.*, her assertions in her verified petition stalking/no-contact order), asserting it shines new light on her character and credibility, along with the court's dismissal of her false accusations against Fuchs

before defendant's trial had ended; and (2) Fuchs's account, which, he asserts, sheds light on Jessica's motive through a parallel situation to this case in which she was dishonest.

¶ 45    The evidence supporting an actual-innocence claim must be (1) new, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. "Material means the evidence is relevant and probative of the petitioner's innocence." *Id.* To be material, the evidence "need not, standing alone, exonerate the defendant; rather, it must tend to 'significantly advance' his [or her] claim of actual innocence." *People v. Stoecker*, 2014 IL 115756, ¶ 33. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. Conclusive means that the additional evidence, "when considered along with the trial evidence, would probably lead to a different result." *Id.* "Probability, not certainty, is the key ***." *Id.* ¶ 97. A piece of new evidence is conclusive if it "would probably change the result on retrial, either by itself or in conjunction with" other new evidence also presented by the petitioner. *People v. Sanders*, 2016 IL 118123, ¶ 53; see *Coleman*, 2013 IL 113307, ¶¶ 104-08 (considering together the statements of all the new witnesses presented by defendant). "[T]he conclusiveness of the new evidence is the most important element of an actual innocence claim." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 46    In his postconviction petition, defendant asserted that, contrary to her victim impact statement, Jessica was in a relationship with Fuchs prior to and during the trial in his case. Further, just days after the verdict, on March 9, 2020, but before sentencing, and unknown to the court,

Jessica had approached Lakemoor police, seeking an order of protection against Fuchs. The court refused to grant the order of protection and found that Jessica's allegations were not credible.

¶ 47    Defendant asserted that Jessica wrote in her petition "nonsensical accusations [against Fuchs], displaying both obvious mental health and severe credibility issues." As examples, he related that, on February 29, 2020, the day after defendant was found guilty, Jessica wrote that she texted Fuchs, stating that he was confused and he had never been her boyfriend, nor had she taken his virginity. She also wrote that, on March 2, 2020, she purchased a Monster caffeine drink at work, spoke to Fuchs that day, and Fuchs mentioned owing her for the Monster. Based on this, she claimed that Fuchs was stalking her because he was not at work that day. (They both worked at Walgreens.) According to defendant, Jessica also claimed that Fuchs was causing her cell phone to not work properly and hacked her Gmail account. She also claimed on March 6, 2020, that Fuchs had control over her phone and could see everything she was doing. Jessica contacted Lakemoor police and filed a report. She sought an order of protection, and the circuit court refused to grant it, finding that Jesscia had not presented credible evidence to meet the burden of proof. The court set the matter for hearing on March 23, 2020. On that date, the case was dismissed for want of prosecution. Jessica did not attend the hearing.

¶ 48    None of the foregoing, defendant asserted in his petition, was known to the circuit court in this case. Nor was the new evidence presented by Fuchs. Specifically, defendant asserted, Fuchs worked with Jessca at Walgreens, and they developed a social relationship over time. They engaged in sexual intercourse on February 14, 2020, and, afterwards, Fuchs referred to himself as her boyfriend. Upon hearing this, Jessica became hostile and told Fuchs that he was not her "boyfriend." Jessica then broke off contact with Fuchs and tried to get him fired from Walgreens.

Just days after the circuit court in this case found her credible, the court in her order-of-protection case found her incredible. Defendant asserted that there was a pattern in Jessica's behavior.

¶ 49    Defendant noted that Jessica appeared to be triggered by the word "boyfriend" in Fuchs's case. In defendant's case, she described their relationship as "casual dating." Further, in Fuchs's case, Jessica reported calling her therapist because Fuchs was controlling and threatening her life. The therapist got the police involved. In defendant's case, Jessica told police that she called her therapist after defendant left her home. However, defendant asserted, she did not do so because the therapist "surely" could have contacted the police. She lied to police about calling her therapist, according to defendant, to add credibility to her claims that she was assaulted by defendant.

¶ 50    The circuit court rejected defendant's actual-innocence claim, finding that his assertion that Jessica was found not credible in the stalking case was a "mischaracterization" and that the failure to present credible evidence is distinguishable from being found not credible. Further, the court found that Jessica's action against Fuchs would not have been admissible at defendant's trial or result in granting a new trial based on a posttrial motion. The circuit court pointed to this court's decision in defendant's direct appeal, wherein we referenced (in support of our conclusion that the evidence was overwhelming) defendant's apology text messages and his videotaped admissions to the police, and the circuit court found they "proved the case against him. *** The reality is defendant supplied all the evidence necessary to convict himself."

¶ 51    Here, defendant contends the circuit court erred in finding that the new evidence was not material. The new evidence, he maintains, parallels Jessica's attack on defendant and shows that she contrived false accusations against him. It was material when a pivotal issue at trial, he contends, was her credibility. It also shows a motive to lie, where, after engaging in a sexual relationship with "ground rules" and after he did not return her sentiment when she said she loved

him,[2] Jessica went to the police with allegations against defendant. Similarly, she engaged in sex with Fuchs and was manipulative when her sentiments on the status of their relationship did not align with his. Defendant also asserts that this evidence would have been admissible to show motive, to impeach Jessica at trial, and to show her state of mind.

¶ 52 Defendant also argues that the trial court erred in finding that the new evidence is not conclusive. He suggests that the only evidence presented against him was provided by Jessica and that he was found guilty because the court found Jessica to be credible. Defendant contends that the circuit court's reliance on his text messages and videotaped admission was erroneous because that evidence actually showed his state of mind that he was hoping to rekindle his relationship with Jessica and that he was exhausted and scared when he spoke to police. He asserts that he was unaware that Jessica did not consent.

¶ 53 The State responds that, at best, the evidence provides incremental impeachment value against Jessica's general credibility but does not directly refute the details of her account or otherwise establish defendant's innocence. It is circumstantial evidence, it asserts, about her general credibility, and does not conclusively establish defendant's innocence. Nor does it account for defendant's contemporaneous statements apologizing to Jessica and expressing remorse to police after the incident. These damning admissions, the State argues, strongly refute defendant's actual-innocence claim.

¶ 54 We conclude that defendant failed to make a substantial showing of actual innocence. The evidence concerning Fuchs was neither material nor conclusive. At best, it somewhat impacted

---

[2]At trial, the court sustained an objection to defendant's testimony that Jessica told him she loved him around 4 a.m. on September 17, 2018.

Jessica's credibility, but ultimately would not have had any bearing on the outcome because, as we noted in our decision in the direct appeal, the evidence against defendant was overwhelming:

> "This case does not merely involve two witnesses with conflicting testimony, a scenario that is generally characterized as presenting a close case. See *Edwards v. Hill-Thomas Lime & Cement Co.*, 378 Ill. 180, 183 (1941) ("The above reference to the conflicting testimony, and the respective theories and contentions of the parties on the record, demonstrates that the case was close on the facts and was one which the jury might have decided either way."). Rather, here, we have the added elements of: (1) defendant's contemporaneous apology text messages; and (2) his near-contemporaneous videotaped admissions to police (which were consistent with Jessica's version of the incident). This evidence rendered incredible his trial denials, especially when considered in conjunction with his attempt to explain the inconsistencies between his trial denials and his contemporaneous admissions—specifically, that he chose to lie (and face potential incarceration) because he did not want to paint Jessica as a liar and that he felt horrible because of what Jessica 'perceived' happened. His attempted explanation was unbelievable and reflects a self-serving desperation to avoid punishment. Given defendant's lack of credibility and the consistency between Jessica's version of the events and defendant's admissions, we can only conclude that the evidence against defendant was overwhelming." *People v. Graf*, 2021 IL App (2d) 200406-U, ¶ 84.

¶ 55    Thus, defendant is incorrect that the only evidence presented against him was provided by Jessica and that he was found guilty because the court found Jessica to be credible. Also, there are insufficient parallels between Jessica's accusations against defendant and her allegations against Fuchs. The allegations against Fuchs centered on him allegedly listening to her calls and knowing

her whereabouts. In contrast, the allegations against defendant led to convictions for criminal sexual assault, criminal sexual abuse, and unlawful restraint, based, in part, on his admissions to police and his text messages.

¶ 56 Further, we reject defendant's argument that the circuit court's reliance on his text messages and videotaped admission was erroneous because that evidence showed his state of mind that he was hoping to rekindle his relationship with Jessica and that he was exhausted and scared when he spoke to police and was unaware Jessica did not consent. These arguments were raised and rejected below and on direct appeal. The evidence of Jessica's allegations concerning Fuchs does not call into doubt the result of the trial.

¶ 57                    B. *Brady* Claim – Allegations Against Fuchs

¶ 58 Next, defendant argues that the circuit court erred in dismissing the petition, where he established that a *Brady* violation occurred when the prosecution withheld evidence of Jessica's accusations and the investigation against Fuchs, the factual basis for which occurred before sentencing in defendant's trial. The same agency that investigated defendant's case-the Lakemoor police department—investigated Jessica's case against Fuchs, defendant notes. Thus, he reasons, it was aware of Jessica's allegations against Fuchs. Defendant argues that, as the case turned on credibility, the police and prosecution were required to disclose the information to him so that he could proceed accordingly with appropriate posttrial motions. Defendant further asserts that the circuit court erred in determining that the evidence was not exculpatory for him and impeaching of Jessica. The court, defendant argues, failed to ascertain that, after establishing relationships with defendant and Fuchs, Jessica turned on them and made false allegations.

¶ 59 The State responds that the evidence regarding Jessica's allegations against Fuchs does not constitute exculpatory or impeaching material and that defendant cannot establish that it was

suppressed or that prejudice resulted from any nondisclosure. Defendant's apology texts and statements to police, it contends, are still very persuasive evidence of guilt, even considering the Fuchs allegations. Also, it asserts that the Fuchs evidence does not directly undermine the existing strong evidence against defendant, and there are strong factual differences between the two situations that diminish the impeachment value here. The State further argues that there is no evidence that the prosecution suppressed the evidence regarding Fuchs or that it was aware of them.

¶ 60 In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* violation claim, a defendant must establish "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. To establish materiality, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The *Brady* rule extends to favorable evidence "known only to police investigators and not to the prosecutor" trying the case. *Id.* at 438; *Beaman*, 229 Ill. 2d at 73.

¶ 61 We reject defendant's argument. As we discussed above in addressing his actual-innocence claim, the evidence concerning Jessica's allegations against Fuchs was not material or conclusive. Further, defendant cannot establish that the evidence is either exculpatory or

impeaching or that it was material so as to undermine confidence in the verdict (or sentence). The insufficient parallels between defendant's case and the allegations against Fuchs do not, in light of the overwhelming evidence against defendant, convince us that defendant made a substantial showing of a *Brady* violation.

¶ 62                    C. Ineffective Assistance of Trial Counsel

¶ 63    Next, defendant argues that the circuit court erred in dismissing his petition, where the petition made a substantial showing that he was denied effective assistance of trial counsel when counsel failed to present readily available evidence and preserve evidentiary and constitutional issues for appeal. First, defendant contends that the circuit court made erroneous evidentiary rulings that trial counsel failed to challenge at trial and/or in his posttrial motion and this court found forfeited as a result. He contends that counsel's errors resulted in this court reviewing the issues for plain error, as opposed to conducting a "less burdensome" (for defendant) harmless-error analysis. Second, defendant argues that trial counsel was deficient for failing to investigate over 7000 text messages between him and Jessica (prior to her allegations against him) that would have shown that his interaction with her on September 17, 2018, was consensual. He contends that counsel knew a forensic examination had been conducted on his phone and had reason to know that there would be materially favorable evidence therein, but rather than listening to defendant and investigating the evidence, counsel accepted the prosecutor's word that the examination contained nothing exculpatory. Without providing specific information, defendant contends that the forensic examination results contained statements by Jessica that could have led to discoverable evidence and/or provided "ammunition" for cross-examination. There is no justification, he argues, for trial counsel's failure to offer and admit the evidence, as this case focused on defendant's and Jessica's credibility. Defendant contends that he would have shown

that Jessica had instructed him that, while she may say "no" or "stop" during foreplay, those words did not have their normal meaning and did not mean for defendant to cease foreplay. Further, he asserted that he would have shown that Jessica asked him to choke her on multiple occasions during foreplay and, during the incident, Jessica asked him to place her in a guillotine chokehold (to which he did, and she did not object). The factfinder would also have benefited, he posits, from hearing that Jessica told defendant that she loved him and that he did not return the sentiment.

¶ 64 To prevail on a claim of ineffective assistance of counsel, defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness" and that such a shortcoming was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*).

¶ 65 We conclude that the circuit court did not err in finding defendant's arguments unavailing. As to the argument that trial counsel failed to preserve various evidentiary rulings, this court, on direct appeal, held that, even if there was error as to the trial rulings concerning Jessica's testimony (specifically, barring testimony from defendant and Jessica that she consented and barring her from testifying on cross-examination that she had asked defendant to place her in a choke hold on prior occasions), there was no plain error because the evidence against defendant was overwhelming. Defendant now cannot claim that, but for counsel's errors, the results would have been different under a harmless-error analysis, where the burden is on the State. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (under the first prong of the plain-error rule, the defendant bears the burden of persuasion with respect to showing prejudice due to the error; under harmless error analysis, the State has the burden of persuasion to show, beyond a reasonable doubt, a lack of prejudice despite

the error). Given that the evidence against defendant, including his admission to police, was overwhelming, a harmless-error argument would not have prevailed. *People v. Laliberte*, 246 Ill. App. 3d 159, 173 (1993) ("One test for harmless error is to examine the other evidence in the case to see if overwhelming evidence supports the conviction.").

¶ 66 Next, as to the evaluation of defendant's phone, certainly, trial counsel has a professional duty and ethical obligation to conduct reasonable investigations (*People v. Domagala*, 2013 IL 113688, ¶ 38), which counsel did not do here when he accepted the prosecution's word concerning whether the phone examination revealed exculpatory evidence. However, we reject defendant's argument, because he cannot show prejudice where he fails to specify what exculpatory or favorable evidence is contained in the text messages. Neither in his petition nor briefs does he elaborate with facts regarding what evidence supports his position. He merely makes either vague or conclusory assertions that texts he wrote and ones he received from Jessica prior to the incident were "important" and "crucial" to his defense, that he conveyed this to trial counsel, who relied on the State's representation that nothing exculpatory was discovered in the forensic evaluation, and that the texts "contained statements by [Jessica] that could have led to discoverable evidence and/or provided ammunition for cross[-]examination." "[N]onspecific and nonfactual assertions are insufficient to require an evidentiary hearing[.]" *People v. Coleman*, 183 Ill.2d 366, 381 (1998). Defendant's assertions, accordingly, are unavailing.

¶ 67                              D. *Brady* Claim – Defendant's Phone

¶ 68 Defendant's final argument is that the circuit court erred in dismissing his petition, where he established that his rights under *Brady* were violated when the State withheld the results of the forensic evaluation of his phone. He maintains that, if trial counsel's representation was adequate when counsel relied upon the State's representation that the results of the evaluation were not

exculpatory, then a *Brady* violation occurred. The results and/or text messages, defendant argues, constituted materially favorable evidence that would have supported his defense at trial. There is a reasonable probability, he asserts, that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Specifically, defendant offers only that months of text messages between him and Jessica "were telling on the nature of their relationship, *i.e.*, the way [Jessica] had previously conducted herself, which is completely material to her credibility[,] as well as her claim of lack of consent."

¶ 69 We reject defendant's argument. He again fails to specify what favorable evidence is contained in the data from his phone, thus, relying solely on conjecture and speculation. Lacking such information, he cannot establish materiality or prejudice. Further, as noted, the evidence of his guilt was overwhelming and did not merely turn on Jessica's credibility. Vague or speculative assertions of favorable evidence are insufficient to support his *Brady* claim. *People v. Ramsey*, 147 Ill. App. 3d 1084, 1090-91 (1986) (a claim of prejudice must be founded upon more than speculation or conjecture).

¶ 70                                      III. CONCLUSION

¶ 71 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 72 Affirmed.